UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Application of<br>THE REPUBLIC OF TÜRKIYE<br>Applicant for an Order pursuant to 28 U.S.C. § 1782 to Conduct Discovery for use in Foreign Proceedings | Case No. 1:24-mc-00557-JPC |

**CEVDET TURKYOLU'S MOTION TO QUASH SUBPOENAS SERVED BY THE REPUBLIC OF TÜRKIYE PURSUANT TO 28 U.S.C. § 1782 AND TO VACATE THE COURT'S AUTHORIZING ORDER**

STEPTOE LLP

Michael C. Miller
Daniel W. Podair
1114 Avenue of the Americas
New York, NY 10036
(212) 506-3900
mmiller@steptoe.com
dpodair@steptoe.com

*Counsel for Cevdet Turkyolu*

Dated: April 25, 2025

# TABLE OF CONTENTS


INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................3

a. The Gülen Movement ....................................................................................3

b. Cevdet Turkyolu ...........................................................................................6

c. The Application ............................................................................................7

ARGUMENT ..........................................................................................................9

I. Turkey Violated Fed. R. Civ. P. 45(a)(4) by Failing to Serve Mr. Turkyolu and the Other Discovery Targets of the Subpoenas with Notice and Copies of the Subpoenas .........................................................................................................9

II. The Court Should Quash the Subpoenas and Vacate its Order ...........................10

a. The Application Fails to Satisfy Section 1782's Statutory "For Use" Requirement Because the Bank Records Will Not Be Used "Impartially" or "Objectively" .................................................................................................11

b. The Application's Vague and Conclusory Allegations Regarding a Money Laundering Investigation Fail to Satisfy Section 1782's Statutory "For Use" Requirement ........................................................................................15

c. Turkey Does Not Substantiate That the Requested Discovery is "For Use" in the Insider Trading Prosecution .....................................................................18

d. The Subpoenas Should be Quashed Because Turkey's Application is Untimely ........................................................................................................19

e. The Bad Faith Nature of Turkey's Request Weighs in Favor of Mr. Turkyolu Under the Second and Third Intel Factors .............................................21

f. The Fourth Intel Factor Weighs in Favor of Quashing Because the Subpoenas Are "Unduly Intrusive" .................................................................22

III. The Foreign Sovereign Immunities Act Does Not Prohibit the Court from Quashing the Subpoenas and Ordering Other Remedial Measures ..................................24

CONCLUSION .....................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Application of 000 Promneftstroy for an Order to Conduct Discovery for Use in a Foreign Proceeding*,
134 F.Supp.3d 789 (S.D.N.Y. 2015)....21

*In re Application of Republic of Turkey*,
2:20-mc-36, 2021 WL 671518 (S.D. Ohio Feb. 22, 2021)....16

*In re Application of the Republic of Türkiye*,
No. 25-mc-00059-JPC-RFT (S.D.N.Y. Feb 10, 2025)....7

*In re Application of Salem*,
24 Misc. 5 (JPC), 2024 WL 3026670 (S.D.N.Y. Jun. 17, 2024) (Cronan, J.).... *passim*

*In Matter of Application for an Order Seeking Discovery Under 28 U.S.C. § 1782*,
24 Misc. 152 (GHW) (GS) 2024 WL 2883293 (S.D.N.Y. May 16, 2024)....18, 19

*In re Ativos Especiais II – Fundo de Investimento em Direitos - NP*,
24-mc-119 (LJL), 2024 WL 4169550 (S.D.N.Y. Sept. 12, 2024)....23

*In re BonSens.org*,
95 F.4th 75 (2d Cir. 2024)....23

*Drexel Burnham Lambert Grp., Inc. v. Committee of Receivers for Galadari*,
12 F.3d 317 (2d Cir. 1993)....24

*EM Ltd. v. Republic of Argentina*,
695 F.3d 201 (2d Cir. 2012)....25

*Euromepa S.A. v. R. Esmerian, Inc.*,
51 F.3d 1095 (2d Cir. 1995)....22

*Fonseca v. Blumenthal*,
620 F.2d 322 (2d Cir. 1980)....11, 12

*Hedgeye Risk Mgmt., LLC v. Dale*,
21-CV-3687 (ALC) (RWL), 2023 WL 4353076 (S.D.N.Y. Jul. 5, 2023)....24

*In re Hornbeam Corp.*,
14 Misc. 424 (Part 1), 2015 WL 13647606 (S.D.N.Y. Sept. 17, 2025)....9

*In re Hully Enterprises, Ltd.*,
358 F.Supp.3d 331 (S.D.N.Y. 2019), *aff'd*, 400 F. Supp. 3d 62 (S.D.N.Y. 2019)....19, 20

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004)........................................................................................ *passim*

*In re Kivisto*,
521 F. Appx. 886 (11th Cir. 2013).........................................................................22

*In re Letter of Request from Crown Prosecution Service of United Kingdom*,
870 F.2d 686 (D.C. Cir. 1989) .............................................................................19

*In re Letters of Request from the Sup. Ct. of H.K.*,
138 F.R.D. 27 (S.D.N.Y. 1991) ..............................................................................9

*In re Letters Rogatory Issued by Dir. of Inspection of Gov't of India*,
385 F2d 1017 (2d Cir. 1967)..................................................................................11

*Mangouras v. Squire Patton Boggs*,
980 F.3d 88 (2d Cir. 2020).................................................................................15, 17

*Nascimento v. Faria*,
600 F.Appx. 811 (2d Cir. 2015)........................................................................11, 20

*In re Navios S. Am. Logistics Inc.*,
24-mc-575 (LJL), 2025 WL 369717 (S.D.N.Y. Feb. 3, 2025) ...............................................23

*Optionality Consulting Pte. Ltd. v. Edge Tech. Grp. LLC*,
18-CV-5393 (ALC) (KHP), 2022 WL 1977746 (S.D.N.Y. June 3, 2022).............................24

*In re Republic of Turkey*,
No. 20 C 5012, 2021 WL 3022318 (N.D. Ill. Jul. 16, 2021) .......................................... *passim*

*In re Request from Italy Pursuant to the Treaty Between the U.S. and the Italian Republic on Mutual Assistance*,
No. M12–329 (RO), 2000 WL 193136 (S.D.N.Y. Feb. 16, 2000) .....................................7, 10

*Siderman de Blake v. Republic of Argentia*,
965 F.2d 699 (9th Cir. 1992) ...............................................................................25

*Sirer v. Aksoy*,
No. 21-cv-22280-BLOOM/Otazo-Reyes, 2023 WL 3166453 (S.D. Fla. May 1, 2023) ..........................................................................................................12

*Smith v. Socialist People's Libyan Arab Jamahiriya*,
101 F.3d 239 (2d Cir. 1996)..................................................................................25

*Yalçınkaya v. Turkey*,
Grand Chamber Judgment 78 Eur. Ct. H.R. 30 (2023)...............................................12, 13, 14

**Statutes**

28 U.S.C. § 1605(a)(1) ........ 24

28 U.S.C. § 1782 ........ *passim*

28 U.S.C. § 1782(a) ........ 2, 10, 11, 22

Foreign Sovereign Immunities Act ........ 3, 24

Turkish Penal Code Article 282 ........ 17

Fed. R. Civ. P. 26(b) ........ 23

Fed. R. Civ. P. 45(a)(4) ........ 1, 9, 10

**Other Authorities**

U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., Turkey 2020 Human Rights Report (2020), https://www.state.gov/wp-content/uploads/2021/10/TURKEY-2020-HUMAN-RIGHTS-REPORT.pdf ........ 5

Balci, *Erdoğan in Trouble: A Series of Resignations in the Erdoğan Government Marred by Corruption*, Carnagie Endowment for International Peace (Dec. 20, 2023), https://carnegieendowment.org/posts/2013/12/erdogan-in-trouble-a-series-of-resignations-in-the-erdogan-government-marred-by-corruption?lang=en. ........ 4

*Calm Before What*, ATLANTIC COUNCIL (June 21, 2013), https://www.atlanticcouncil.org/blogs/new-atlanticist/turkey-calm-returns-but-calm-before-what/ ........ 3, 4

*Fethullah Gulen, Turkish cleric once blamed for failed coup attempt, dies at 83*, CNN (Oct. 21, 2024),https://edition.cnn.com/2024/10/21/middleeast/fethullah-gulen-turkish-cleric-dies-at-83-intl/index.html ........ 5

*Corruption*, CARNAGIE ENDOWMENT FOR INTERNATIONAL PEACE (Dec. 20, 2023), https://carnegieendowment.org/posts/2013/12/erdogan-in-trouble-a-series-of-resignations-in-the-erdogan-government-marred-by-corruption?lang=en ........ 3

*Letter from Congress to President Joseph R. Biden* (Jul. 2, 2024) https://chrissmith.house.gov/uploadedfiles/rep_smith_turkey_human_rights_letter _to_president_biden.pdf ........ 6

U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., Turkey (TÜRKIYE) 2022 Human Rights Report (2022), https://www.state.gov/wp-content/uploads/2023/03/415610_TÜRKIYE-2022-HUMAN-RIGHTS-REPORT.pdf (the "2022 State Department Report") ....................5

Ginger Hervey, EU anti-terror chief: Gülen network not terrorist organization, POLITICO (Nov. 30, 2017), https://www.politico.eu/article/fethullah-gulen-gilles-de-kerchove-eu-anti-terror-chief-gulen-network-not-terrorist-organization/ ....................4

*Carlotta Gall, Americans Jailed After Failed Coup in Turkey Are Hostages to Politics*, NY TIMES (Oct. 7, 2017), https://www.nytimes.com/2017/10/07/world/europe/turkey-american-detainees.html ....................6

*Hans Smit, American Assistance to Litigation in Foreign and International Tribunals: Section 1782 of Title 28 of the U.S.C.) Revisited*, 25 Syracuse J. Int'l L. & Com. 1 (1998) ....................22

*Turkey officially designates Gülen religious group as terrorists*, REUTERS (May 31, 2016) https://www.reuters.com/article/idUSKCN0YM17F/ ....................4

U.S. Dep't of State, Bureau of Counterterrorism, Country Reports on Terrorism 2021: Turkey, https://www.state.gov/reports/country-reports-on-terrorism-2021/turkiye ....................4

*U.S. urges Turkey to protect democratic values after media rate* REUTERS (Dec.14, 2014) ....................4

Interested Party Cevdet Turkyolu (the "Mr. Turkyolu") respectfully submits this Memorandum of Law in Support of his Motion to quash the subpoenas served by the Republic of Türkiye ("Turkey") on Bank of America, N.A. and Wells Fargo, N.A. (the "Banks" and the "Subpoenas") pursuant to its *ex parte* 28 U.S.C. § 1782 application ("Section 1782" and the "Application") and to vacate the Court's order granting the Application and authorizing issuance of the Subpoenas (the "Order").

## INTRODUCTION

Turkey seeks to misuse Section 1782 to further its campaign against its political opponents. Mr. Turkyolu and the four other ultimate targets of the Application (together, the "Discovery Targets") are members of the Gülen movement, a faith based civic society initiative which has been targeted by Turkey's government for political reasons. The Application is a part of the Turkish government's well-documented, prolonged, and improper campaign of harassment and abuse directed against the Gülen movement and its members. If the Subpoenas are not quashed and the Order not withdrawn, it will set a dangerous precedent, inviting Turkey to use Section 1782 yet again to target political opponents.

The Subpoenas should be quashed and the Order vacated for several reasons. First, Turkey failed to serve Mr. Turkyolu and the other Discovery Targets with notice and copies of the Subpoenas in violation of Fed. R. Civ. P. 45(a)(4). Unless an authorizing order provides otherwise, a Section 1782 subpoena seeking discovery in aid of a foreign criminal proceeding must be served on the parties to the foreign proceeding in compliance with the Federal Rules of Civil Procedure.

Second, the Application does not satisfy the statutory requirements of Section 1782. Specifically, the Application does not seek discovery "for use" in a proceeding in a foreign or

international tribunal. 28 U.S.C. § 1782(a). For decades, the Second Circuit has read the "for use" requirement in Section 1782 to entail use in an "impartial" and "objective" adjudication. Due to Turkey's campaign against members of the Gülen movement, and the related erosion of judicial independence in Turkey, the evidence sought by the Application will not be weighed "impartially" or "objectively." The Application also fails to satisfy Section 1782's "for use" requirement because its vague and conclusory allegations do not provide any detail substantiating its purported "investigation for potential money laundering." ECF No. 1 ¶ 2. Nor does Turkey establish that the Subpoenas seek documents "for use" in its insider trading prosecution.

Third, the discretionary factors listed by the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004) weigh in favor of quashing the Subpoenas and vacating the Order. For starters, Turkey's request, which concerns events that occurred over a decade ago and an investigation initiated at least nine years ago, is untimely. The second and third discretionary *Intel* factors also weigh in favor of Mr. Turkyolu because the records sought by Turkey will not be used in a legitimate foreign criminal proceeding with basic due process protections, but to further Turkey's bad faith campaign against members of the Gülen movement. The fourth *Intel* factor weighs in favor of Mr. Turkyolu because the Subpoenas, which seek sensitive financial records spanning over twenty-two years (December 2002 to present), are "unduly intrusive." The Application, to the extent it describes any purported criminal activity, describes events that occurred during a few months in 2014. In addition, the Subpoenas are only "nominally" seeking discovery for use in the alleged proceedings mentioned in the Application. It appears that Turkey intends to use the discovery for a criminal proceeding that Turkey did not disclose to the Court in its Application.

Finally, the Foreign Sovereign Immunities Act does not bar the Court from providing Mr. Turkyolu with the relief he seeks. By seeking Section 1782 discovery, Turkey has submitted to the Court's jurisdiction. Therefore, Turkey cannot invoke its status as a foreign sovereign as a means of limiting the Court's ability to manage Turkey's conduct.

For these reasons, Mr. Turkyolu respectfully requests that the Court issue an order quashing the Subpoenas, vacating the Order, and directing Turkey to cease using, and to destroy, all copies of the records produced by the Banks (the "Bank Records").

## BACKGROUND

### *a. The Gülen Movement*

The Gülen movement emerged from the sphere of Civil Islam in the late 1960's under the leadership of Fetullah Gülen, a Turkish scholar, who lived in self-exile in Pennsylvania from 1999 until his passing in 2024. *See* Declaration of Cevdet Turkyolu ("Turkyolu Dec.") ¶ 4. The Gülen movement is known for its emphasis on and commitment to active civic participation, community service, and open dialogue, all grounded in modern and democratic principles. *Id.* ¶ 5. Prior to 2013, the Gülen movement was allied with President Recep Tayyip Erdogan and his Justice and Development Party (the "AKP") in Turkey. *See* Balci, *Erdoğan in Trouble: A Series of Resignations in the Erdoğan Government Marred by Corruption*, CARNAGIE ENDOWMENT FOR INTERNATIONAL PEACE (Dec. 20, 2023), https://carnegieendowment.org/posts/2013/12/erdogan-in-trouble-a-series-of-resignations-in-the-erdogan-government-marred-by-corruption?lang=en.

However, in or around 2013, the relationship between the Gülen movement and the AKP began to fray. *Id.; see also* Ross Wilson, *Turkey: Calm Returns – but Calm Before What*, ATLANTIC COUNCIL (June 21, 2013), https://www.atlanticcouncil.org/blogs/new-atlanticist/turkey-calm-returns-but-calm-before-what/. In June 2013, Mr. Gülen made public

remarks criticizing the AKP and President Erdogan for their handling of a series of public protests in Turkey. *Id.* Also, in 2013, Turkish law enforcement started criminal investigations into conduct of members of the AKP and Mr. Erdogan's inner circle. *See* Balci, *Erdoğan in Trouble: A Series of Resignations in the Erdoğan Government Marred by Corruption*. Mr. Erdogan and his government expressed anger with Mr. Gülen's criticism and blamed members of the Gülen movement who were employed by the Turkish government for the criminal investigations. *Id.* Mr. Erdogan's government then accused Mr. Gülen and his followers of being terrorists, referring to the Gülen movement as the Fetullahist Terrorist Organization ("FETÖ") and a threat to national security. *See U.S. urges Turkey to protect democratic values after media rate* REUTERS (Dec.14, 2014), https://www.reuters.com/article/amp/idUSL1N0TY0GZ20141214; *see also, Turkey officially designates Gülen religious group as terrorists*, REUTERS (May 31, 2016), https://www.reuters.com/article/idUSKCN0YM17F/.

The Gülen movement is not a terrorist organization. The European Union, through its counter-terrorism coordinator, concluded in 2017 that the Gülen movement is not a terrorist organization, and that the EU would need "substantive" evidence to conclude otherwise. Ginger Hervey, EU anti-terror chief: Gülen network not terrorist organization, POLITICO (Nov. 30, 2017), https://www.politico.eu/article/fethullah-gulen-gilles-de-kerchove-eu-anti-terror-chief-gulen-network-not-terrorist-organization/. Similarly, the U.S. State Department concluded in 2021 that the Gülen movement is not a terrorist organization. U.S. Dep't of State, Bureau of Counterterrorism, Country Reports on Terrorism 2021: Turkey, https://www.state.gov/reports/country-reports-on-terrorism-2021/turkiye.

In July 2016, the Erdogan administration's campaign against members of the Gülen movement increased, following an attempted coup in Turkey. The Erdogan government falsely blamed the Gülen movement for the attempted coup. Jessie Yeung and Lucas Lilieholm, *Fethullah Gulen, Turkish cleric once blamed for failed coup attempt, dies at 83*, CNN (Oct. 21, 2024),https://edition.cnn.com/2024/10/21/middleeast/fethullah-gulen-turkish-cleric-dies-at-83-intl/index.html. Following the attempted coup, the Turkish government declared a state of emergency and unleashed criminal investigations and prosecutions of Gülen movement members and closed or took over companies that were affiliated with those members. *See* U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., Turkey 2020 Human Rights Report (2020) at 1, 22, 28, 32, 39, 62, https://www.state.gov/wp-content/uploads/2021/10/TURKEY-2020-HUMAN-RIGHTS-REPORT.pdf (the "2020 State Department Report").

As part of this purge, the Turkish government "dismissed or suspended… more than 60,000 police and military personnel and more than 4,000 judges and prosecutors, arrested or imprisoned more than 95,000 citizens, and closed more than 1,500 nongovernmental organizations on terrorism-related grounds, primarily for alleged ties to the movement of cleric Fethullah Gulen." *Id.* at 1. By the sixth anniversary of the 2016 coup attempt, Turkey "had detained 332,884 and arrested 101,000 individuals… on grounds of alleged affiliation with the Gulen movement." *See* U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., Turkey (TÜRKIYE) 2022 Human Rights Report (2022) at 11-12, https://www.state.gov/wp-content/uploads/2023/03/415610_TÜRKIYE-2022-HUMAN-RIGHTS-REPORT.pdf (the "2022 State Department Report"). This included a dozen Americans arrested in Turkey for purported ties to the Gülen movement. *See Carlotta Gall, Americans Jailed After Failed Coup in Turkey*

*Are Hostages to Politics*, NY TIMES (Oct. 7, 2017), https://www.nytimes.com/2017/10/07/world/europe/turkey-american-detainees.html.

In recent years, international observers, including the U.S. government, have expressed grave concern about the Turkish government's treatment of the Gülen movement and its members. For example, the State Department has detailed Turkey's troubling pattern of "transnational repression," explaining that the Turkish "government engaged in a worldwide effort to apprehend suspected members of the Gulen movement." 2022 State Department Report" at 23. This included Turkey placing "bilateral pressure on other countries to take adverse action against specific individuals, at times without due process." *Id.* at 23.

Last year, over 140 members of Congress from both parties wrote to President Biden regarding "the deeply concerning human rights situation in Turkey, particularly the transnational repression campaign orchestrated by President Recep Tayyip Erdogan's government against its critics abroad." *Letter from Congress to President Joseph R. Biden* (Jul. 2, 2024) at 1, https://chrissmith.house.gov/uploadedfiles/rep_smith_turkey_human_rights_letter_to_president_biden.pdf. The letter specifically addressed Turkey's campaign against the Gülen movement, citing "the "forcible transfer" of members to Turkey and the exertion of pressure on foreign countries to close schools "affiliated with the Gulen movement." *Id.* at 1-2.

***b. Cevdet Turkyolu***

Cevdet Turkyolu has been a member of the Gülen movement since 1972 when he began attending Mr. Gülen's sermons in the city of Izmir. Turkyolu Dec. at ¶ 6. Starting in 1974, Mr. Turkyolu served as a trusted and loyal aide to Mr. Gülen. *Id.* at ¶ 7

In 1999, Mr. Turkyolu accompanied Mr. Gülen when he moved to the United States. *Id.* at ¶ 8. Mr. Turkyolu served as Mr. Gülen's personal assistant and was responsible for managing Mr. Gülen's daily schedule until Mr. Gülen's death in October 2024. *Id.*

As relations soured between President Erdogan and Mr. Gülen, the Turkish government began to target Mr. Turkyolu. *Id.* at ¶¶ 10, 11. The Turkish government subsequently, and unlawfully, confiscated multiple businesses owned by Mr. Turkyolu. *Id.* at ¶ 11.

In June 2016, Turkey charged Mr. Turkyolu, along with Mr. Gülen and other senior members of the Gülen movement, with a range of unfounded and blatantly politically motivated charges (the "June 2016 Indictment").[1] *See In re Application of the Republic of Türkiye Applicant for an Order pursuant to 28 U.S.C. § 1782 to Conduct Discovery for use in Foreign Proceedings*, No. 25-mc-00059-JPC-RFT, ECF No. 1-1 (S.D.N.Y. Feb 10, 2025); *see* Declaration of Michael C. Miller ("Miller Dec."), Exhibit 1. Turkey failed to disclose the June 2016 Indictment against Mr. Turkyolu in its Application.

Turkey has continued to target Mr. Turkyolu as a political opponent even though he has not stepped foot in Turkey since 1999. *See* Turkyolu Dec. at ¶ 9. Turkey has opened several other politically motivated investigations into Mr. Turkyolu due to his prominent position in the Gülen movement, including those at issue in the Application. Mr. Turkyolu has also been subjected to relentless defamatory attacks by the government-aligned Turkish media. *Id.* at ¶ 12.

***c. The Application***

On December 3, 2024, Turkey filed the Application seeking permission to serve the Subpoenas on the Banks. Turkey represented in the Application that it was seeking "discovery in aid of an ongoing criminal prosecution of Cevdet Turkyolu, Hasan Sayin, Ybrahym Sayin,

---

[1] Turkey has not alleged that the money laundering investigation or insider trading prosecution at issue in the Application relates in any way to the June 2016 Indictment.

Muhammet Erhan Koseoylu, and Ferhat Aktay for insider trading, as well as an investigation for potential money laundering." ECF No. 1 ¶ 2.

In support of the Application, Turkey produced a copy of a June 20, 2017 indictment charging Mr. Turkyolu and the other Discovery Targets with alleged "information abuse" (the "June 2017 Indictment"). *See* ECF No. 1-4. The Application also included a declaration from Veysel Kaçmaz, the Deputy Chief Prosecutor of Ankara, dated November 20, 2024 (the "Kaçmaz Declaration"). *See* ECF No. 1-2.

The June 2017 Indictment alleges that Mr. Turkyolu and the other Discovery Targets traded on "inside information" regarding a "strategic partnership" between Bank Asya, a Turkish Bank affiliated with the Gülen movement, and Qatar Islamic Bank. *See generally* ECF No. 1-4.

However, the Application provides scant detail about Turkey's alleged money laundering investigation[2]. The Kaçmaz Declaration simply states that Turkey is investigating:

> [W]hether the proceeds of illicit activities (including those taking place within the United States of America) have been transmitted and transferred, through international wire transfers and other means, to individuals and entities operating within the Republic of Türkiye in violation of the prohibitions of money laundering codified in Article 282 of the Turkish Penal Code.

ECF No. 1-2 ¶ 5.

The Application included copies of the Subpoenas which called for the Banks to produce broad swaths of financial records related to Mr. Turkyolu and the other Discovery Targets from "December 18, 2002, until now." ECF No. 1-3 at 5, 17.

On December 17, 2024, the Court issued the Order authorizing Turkey to serve the Subpoenas on the Banks. *See* ECF No. 5. Turkey served the Subpoenas on the Banks on

---

2 The Kaçmaz Declaration refers to "active and ongoing prosecutions…for insider trading *and money laundering*." (emphasis added). ECF Doc. 1-2 ¶ 3. However, the Application otherwise refers to a money laundering *investigation* rather than an "active and ongoing prosecution" and provides no evidence to the contrary (i.e., a money laundering indictment). *See* ECF Docs. 1-2 ¶ 5 (focus is on "whether" money laundering violation occurred); 1 ¶ 2 ("an investigation for potential money laundering"); 2 at 1 ("an ongoing investigation of potential money laundering").

December 18, 2024 (Bank of America) and December 23, 2024 (Wells Fargo); *See* Miller Dec. Ex. 2. However, Turkey did not serve Mr. Turkyolu or the other Discovery Targets with notice or copies of the Subpoenas. By the time Mr. Turkyolu learned of the Subpoenas, the Banks had already produced the Bank Records to Turkey.

## ARGUMENT

### I. Turkey Violated Fed. R. Civ. P. 45(a)(4) by Failing to Serve Mr. Turkyolu and the Other Discovery Targets of the Subpoenas with Notice and Copies of the Subpoenas

Turkey violated Fed. R. Civ. P. 45 (a)(4) by failing to serve Mr. Turkyolu and the other Discovery Targets with notice and copies of the Subpoenas.

"Pursuant to the text of § 1782, unless the district court's order authorizing discovery provides otherwise, 'the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.' *In re Hornbeam Corp.*, 14 Misc. 424 (Part 1), 2015 WL 13647606, at *5 (S.D.N.Y. Sept. 17, 2025) (citing 28 U.S.C. § 1782(a)). Fed. R. Civ. P. 45(a)(4) provides that "[i]f [a] subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, then before it is served on the person to whom it is directed, a notice and a copy of the subpoena *must be served on each party*." (emphasis added) *See also In re Application of Salem*, 24 Misc. 5 (JPC), 2024 WL 3026670, at *10 (S.D.N.Y. Jun. 17, 2024) (Cronan, J.) (recognizing that the applicant "ran afoul of Federal Rule of Civil Procedure 45(a)(4) when he failed to serve notice and a copy of the Subpoena" on opposing party in foreign litigation).

Courts in this circuit have long recognized that, unless otherwise prescribed, the Federal Rules of Civil Procedure govern Section 1782 requests seeking discovery in support of foreign criminal proceedings. *In re Letters of Request from the Sup. Ct. of H.K.*, 138 F.R.D. 27, 31

(S.D.N.Y. 1991) (target of foreign criminal proceeding entitled to notice of depositions ordered pursuant to Section 1782 "unless the Orders prescribed procedures other than the Civil Rules'"); *In re Request from Italy Pursuant to the Treaty Between the U.S. and the Italian Republic on Mutual Assistance*, No. M12–329 (RO), 2000 WL 193136, at *2 (S.D.N.Y. Feb. 16, 2000) ("[u]nder 28 U.S.C. § 1782, where the order requiring the testimony 'does not prescribe otherwise, the testimony ... shall be taken ... in accordance with the Federal Rules of Civil Procedure.'").

The Order permitted Turkey "to serve the Respondent Banks with the subpoenas substantially in the form annexed as Exhibit 3 to the Application, Dkt. 1." ECF No. 5 at 3. Each of the subpoenas annexed to Exhibit 3 explicitly reference Fed. R. Civ. P. 45(a)(4) and state "[a] notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed." ECF No. 1-3 at 2, 14. Therefore, Turkey "ran afoul" of Fed. R. Civ. P. 45(a)(4), and its own representations to the Court, when it failed to serve Mr. Turkyolu and the other Discovery Targets with notice or copies of the Subpoenas. *Salem*, 2024 WL 3026670, at *10.

## II. The Court Should Quash the Subpoenas and Vacate its Order

"[A] district court is authorized to grant a Section 1782 request where: '(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person.'" *Salem*, 2024 WL 3026670 at *9 (citation omitted).

However, "a district court is not required to grant a § 1782(a) discovery application simply because it has the authority to do so." *Intel Corp.*, 542 U.S. at 264. Instead, "once

statutory requirements are met, 'a district court is free to grant discovery in its discretion.'" *Nascimento v. Faria*, 600 F.Appx. 811, 812 (2d Cir. 2015) (internal citation omitted).

Therefore, if the statutory requirements of Section 1782 are satisfied, "a court then assesses whether it should exercise its discretion to grant the requested assistance in light of the following factors set out by the Supreme Court in *Intel Corp. v. Advanced Micro Devices*: (1) whether 'the person from whom discovery is sought is a participant in the foreign proceeding'; (2) 'the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance'; (3) 'whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States'; and (4) whether the request is 'unduly intrusive or burdensome.'" *Salem*, 2024 WL 3026670 at *9 (citing *Intel Corp* 542 U.S. at 264-65).

***a. The Application Fails to Satisfy Section 1782's Statutory "For Use" Requirement Because the Bank Records Will Not Be Used "Impartially" or "Objectively"***

The Second Circuit has long interpreted the term "foreign tribunal" to mean a forum in which the requested evidence can be weighed in an "impartial" or "objective" manner. *Fonseca v. Blumenthal*, 620 F.2d 322, 324 (2d Cir. 1980) (rejecting use "inconsistent with the concept of impartial adjudication intended by the term 'tribunal.'"); *In re Letters Rogatory Issued by Dir. of Inspection of Gov't of India*, 385 F2d 1017, 1021 (2d Cir. 1967) (recognizing Congress intended Section 1782 for use in proceedings with "complete objectivity normally associated with a 'tribunal.'"). Evidence can be weighed "impartially" or objectively" where "the government and the accused are each represented to an equal degree before the ju[d]ge." *Fonseca*, 620 F.2d at 324. On the contrary, "'an institutional interest in a particular result'…is inconsistent with the

concept of impartial adjudication intended by the term 'tribunal'." *Id.* (quoting *Letters Rogatory (India)*, 385 F.2d at 1020). In making this determination, "one useful guideline is the absence of any degree of separation between the prosecutorial and adjudicative functions." *Letters Rogatory (India)*, 385 F.2d 1021.

In light of the Turkish government's well-documented and prolonged campaign against members of the Gülen movement and the overall erosion of judicial independence in Turkey, the Bank Records will not be weighed "impartially" or "objectively" against Mr. Turkyolu. Under no circumstances will Mr. Turkyolu and the Turkish government be "represented to an equal degree" before a judge. *Fonseca*, 620 F.2d at 324. Rather, Turkish courts will have an "institutional interest" in Mr. Turkyolu's conviction. *Fonseca*, 620 F.2d at 324 (quoting *Letters Rogatory (India)*, 385 F.2d at 1020).

At least one U.S. court has explicitly recognized Turkey's failure to afford suspected members of the Gülen movement basic due process rights, including the right to have their case heard in an "objective" or "impartial" manner. *See Sirer v. Aksoy*, No. 21-cv-22280-BLOOM/Otazo-Reyes, 2023 WL 3166453, at *7 (S.D. Fla. May 1, 2023) ("Turkey has engaged in an open campaign of repression against individuals with perceived or actual ties to FETÖ [Turkey's name for the Gülen movement]. The Turkish regime has frequently targeted individuals— including U.S. nationals—for prosecution on the basis of vindictive rumors and secret testimony, and has left detainees with few due process protections to defend themselves.").

A respected international court recently reached a similar conclusion. In *Yalçınkaya v. Turkey*, the European Court of Human Rights expressed concern about the Turkish judiciary's deeply biased and unfair treatment of suspected Gülen movement members. Yalçınkaya alleged that Turkish courts violated basic notions of due process including his right to a fair trial, by

overlooking the unlawful collection of evidence against him by the Turkish government, refusing to provide him with access to the evidence against him, and ultimately convicting him of membership in the Gülen movement based on the mere use of a mobile messaging application. The ECHR agreed that Yalçınkay's right to a fair trial had been violated and stated among its many troubling conclusions:

> [T]he domestic courts were required to take adequate measures to ensure the overall fairness of the proceedings against the applicant. As demonstrated above, this they failed to do. In the Court's view, the domestic courts' failure to put in place appropriate safeguards vis-à-vis the key piece of evidence at issue to enable the applicant to challenge it effectively, to address the salient issues lying at the core of the case and to provide reasons justifying their decisions was incompatible with the very essence of the applicant's procedural rights under Article 6 § 1 [of the European Convention on Human Rights]. These failings had the effects of undermining the confidence that courts in a democratic society must inspire in the public and of breaching the fairness of the proceedings.

*Yalçınkaya v. Turkey*, Grand Chamber Judgment 78 Eur. Ct. H.R. 30, 1045 (2023); *see* Miller Dec. Ex. 3; *see also Id.* ¶ 271 (concluding that Turkish courts, "effectively attached objective [i.e. strict] liability to the use of" the messaging application as constituting membership in a terrorist organization); ¶ 341 (recognizing "well-founded" concerns about "the conduct of the criminal proceedings 'as a matter of form' only.").

The Turkish courts' failure to exercise meaningful oversight over the Turkish government and their alignment in securing Yalçınkaya's conviction exemplifies an "institutional interest in a particular result." *See Letters Rogatory (India)*, 385 F.2d at 1020.The Yalçınkaya proceeding also illustrates an "absence of any degree of separation between the prosecutorial and adjudicative functions." *Id.* at 1021; *see also* Congressional Letter to Biden at 2 (recognizing that the *Yalçınkaya* case as well as two other recent decisions by the ECHR "highlight the systemic nature of human rights abuses in Turkey and its disregard for

international legal standards."). In this case, there is no reason to believe the Turkish government will treat Mr. Turkyolu any differently than it did Yalçınkaya.

The Turkish government's campaign against the Gülen movement has been coupled with and facilitated by an overall erosion of judicial independence in Turkey. The State Department has repeatedly expressed concern about the state of judicial independence in Turkey. *See* 2020 State Department Report at 16 (noting "[t]he law provides for an independent judiciary, but there were indications the judiciary remained subject to influence, particularly from the executive branch"); 2022 State Department Report at 16 ("[t]he judiciary faced several problems that limited judicial independence, including intimidation and reassignment of judges and allegations of interference by the executive branch."). The State Department also recognized reports that "the outcome of some trials appeared predetermined or pointed to judicial interference." 2020 State Department Report at 17; 2022 State Department Report at 17.

Key international organizations have voiced similar fears about the eroding independence of the Turkish judiciary. Last year, the United Nations Special Rapporteur on the independence of judges and lawyers wrote to the Turkish government about the troubling attacks on judicial independence in Turkey. This included (a) purging over a third of the Turkish judiciary after the coup attempt in July 2016, (b) failure of lower courts (with encouragement of the executive) to adhere to the decisions of Turkey's Constitutional Court, (c) attacks on attorneys, including their arrest, (d) lack of due process in criminal matters (including in the *Yalçınkaya* case), and (e) reprisals against judges on the basis of their judicial decisions. *See generally*, Letter from Special Rapporteur on the independence of judges and lawyers (June 21, 2024); *see* Miller Dec. Ex. 4.

The correspondence also noted troubling constitutional reforms impeding the independence of the High Council of Judges and Prosecutors, which "is charged with the general

responsibilities concerning the organization and functioning of the judiciary, including appointments, transfers, promotions, sanctions, and dismissals." *Id.* at 3. Following these reforms, "the careers of judges and prosecutors across the country is *de facto* under the control of the executive power… jeopardizing the judiciary's independent delivery of justice." *Id.*

The overall erosion of judicial independence will prevent Mr. Turkyolu from receiving an "impartial" and "objective" hearing before the Turkish courts. In short, Turkey has failed to meet the "for use" requirement in Section 1782 and, for this reason alone, the Court should quash the Subpoenas and vacate the Order.

***b. The Application's Vague and Conclusory Allegations Regarding a Money Laundering Investigation Fail to Satisfy Section 1782's Statutory "For Use" Requirement***

Turkey's "vague and conclusory statements" regarding an ongoing "money laundering" investigation do not substantiate the existence of a "foreign proceeding" under Section 1782. *In re Republic of Turkey*, No. 20 C 5012, 2021 WL 3022318, at *4 (N.D. Ill. Jul. 16, 2021).

In seeking assistance under Section 1782, an applicant must "provide sufficient 'objective indicia' that…[c]riminal proceedings [are], at any point, more than merely speculative." *Mangouras v. Squire Patton Boggs*, 980 F.3d 88, 101 (2d Cir. 2020). To satisfy this standard, applicants are required to "provide the legal theory supporting such a proceeding" which "lay[s] out either the content of [their] claims or [] a sufficiently concrete basis for" their allegations. *Id.* (explaining that vague and conclusory statement alleging "false testimony" did not suffice). In addition, the applicant must "provide sufficiently 'reliable indications of the likelihood that proceedings will be instituted within a reasonable time.' *Id.* (citation omitted).

At least one other U.S. court has concluded that a similar application made by Turkey targeting the Gülen movement did not meet this standard. *See Republic of Turkey*, 2021 WL

3022318 at *4. In that case Turkey's application was based on similarly "vague and conclusory statements from two Turkish officials":

> This letter confirms that Law Enforcement Authorities of the Republic of Turkey are conducting various criminal investigations into Fethullah Gulen and his organization for suspected criminal activity.
>
> ....
>
> Specifically, Turkish authorities are investigating a scheme through which criminally derived funds are being laundered from certain corporations and individuals throughout the United States, and then returned to Turkey for the continued financing of illicit activities in violation of Turkish laws.

*Id.* The court rejected Turkey's request, concluding "[i]f this Court were to accept Turkey's application 'at face value,' its submissions may reflect 'more of a fishing expedition' into the respondents' financial activities 'than a legitimate use of § 1782 to further pursuit of criminals.' *Id.* (citation omitted).

Another U.S. district court examining a substantially similar request for assistance did not decide whether the "for use" requirement was met. However, the Court was troubled by the vague description of Turkey's investigation, stating "[t]hese bare minimum assertions seem to distinguish the situation here from those where courts have found sufficient indicia of a contemplated proceeding." *In re Application of Republic of Turkey*, 2:20-mc-36, 2021 WL 671518, at *7 (S.D. Ohio Feb. 22, 2021) (citing *Mangoura* among other cases).[3]

Turkey is following the same playbook in this case by offering "speculative" and "[in]sufficiently concrete" statements regarding its purported money laundering investigation. *Mangouras*, 980 F.3d at 101. Turkey asserts in a "vague and conclusory" manner that its

---

[3]The court "assume[d], without deciding, that the second statutory requirement [was] met." *Id.* The court's assumption was based on Turkey's submission, through counsel, of a lengthy statement of facts detailing its investigation. Turkey's Application in this proceeding does not contain close to this level of detail.

A later court concluded that the "for use" requirement was met on the basis of this lengthy statement of facts while recognizing "the vagueness" of Turkey's own statements about the investigation. *Republic of Turkey*, No. 20-mc-00036-ALM-EPD, ECF. No. 28 at 9 (S.D. Ohio Sept. 11, 2023); *See* Miller Dec., Ex. 4.

investigation concerns "whether the proceeds of illicit activities…have been transmitted and transferred, through international wire transfers and other means, to individuals and entities operating within the Republic of Türkiye in violation of the prohibitions of money laundering codified in Article 282 of the Turkish Penal Code." ECF No. 1-2 ¶ 5 (Kaçmaz Declaration); *Republic of Turkey*, 2021 WL 3022318 at *4. And nothing more.

Turkey does not state what these "illicit activities" entailed, when the activities or transactions took place, or that these activities or the transactions involved Mr. Turkyolu or any of the other Discovery Targets. *See Republic of Turkey*, 2021 WL 3022318 at *4 ("[t]he petitioner's application suggests that numerous investigations into 'illicit activities' are underway in Turkey, but it offers nothing about what those claimed illicit activities are, nor does it offer any support for the proposition that these activities, whatever they are, are being funded by any of the respondents or others in the United States who are within the scope of the matters targeted by the section 1782 application"). Turkey states that "[t]he Financial Crimes Investigation Board of the Republic of Türkiye…has identified various transactions Turkyolu has conducted with" the Banks and includes these transactions in a chart affixed to the Subpoenas. ECF Docs. 1-2 ¶ 6 1-3 at 9, 21. However, Turkey does not allege that these "various transactions" are in any way related to the money laundering investigation or other illegal activity.

It is, therefore, no surprise that Turkey's description of its purported money laundering investigation fails to articulate the basic elements of a money laundering offense under the Turkish statute it seeks to enforce. *See* Declaration of Murat Akkoc ("Akkoc Dec."). Under Turkish Penal Code Article 282, "assets" in a money laundering scheme must be "acquired as a result of *an offense* which carries a minimum penalty of one year imprisonment." *Id.* ¶ 9. Article 282 also requires "transfer [of] such asset abroad or to give the impression that such asset has

been legitimately acquired and conceal the illegitimate source of such." *Id.* ¶ 9. The Application does not allege that any of the Discovery Targets has been convicted of a predicate "offense." *See generally* ECF No. 1; *Id.* ¶ 10-14 In addition, the Application only claims that "the proceeds of illicit activities…have been transmitted and transferred…to individuals and entities operating *within the Republic of Türkiye*." ECF No. 1-2 ¶ 5 (emphasis added); *Id.* ¶10-14.

Turkey's Application, as it pertains to its purported money laundering investigation, seeks nothing more than an impermissible "fishing expedition" and should be denied. *See In re Republic of Turkey*, 2021 WL 3022318 at *4 (internal citation omitted). *See also Matter of Application for an Order Seeking Discovery Under* 28 U.S.C. § 1782, 24 Misc. 152 (GHW) (GS), 2024 WL 2883293, *4-7 (S.D.N.Y. May 16, 2024) (concluding that vague allegations of criminal investigations in Mexico did not establish the existence of a "proceeding" under Section 1782's "for use" requirement.").

Turkey's fishing expedition is particularly troubling given the larger political dynamics at play. For this additional reason, it would be "particularly imprudent" to allow Turkey to either seek compliance with the Subpoenas or to use the Bank Records. *See In re Republic of Turkey*, 2021 WL 3022318 at *4 (accepting Turkey's vague claims would be "particularly imprudent given the claimed political overlay" regarding Turkey and the Gülen movement).

***c. Turkey Does Not Substantiate That the Requested Discovery is "For Use" in the Insider Trading Prosecution***

Turkey fails to establish that the requested discovery is "for use" in the insider trading proceeding.

An applicant must provide sufficient information for a "district court [to] reasonably conclude that the [requested] records [will] be used in a criminal trial." *In re Letter of Request*

*from Crown Prosecution Service of United Kingdom*, 870 F.2d 686, 691 (D.C. Cir. 1989) (quoting *In re Request for Assistance from Ministry of Legal Affairs of Trinidad and Tobago*, 848 F.2d 1151, 1156 (11th Cir. 1988)). This includes "set[ting] forth the documents [] desired, the information [the applicant] expect[s] to find, and the reason [for] [] use [of] the documents in the eventual proceeding." *Id.*

Turkey does not meet this standard. Although Turkey shares the June 2017 Indictment alleging that Mr. Turkyolu and the Other Targets engaged in insider trading, it does not explain how its request is relevant to that proceeding. The Kaçmaz Declaration simply states that "[t]he information sought from these banks would be highly relevant to our ongoing criminal prosecutions and is admissible in Turkish prosecutions, and therefore it is crucial that my office receives access to any records held by the banks at issue." ECF No. ¶ 8. The Kaçmaz Declaration does not describe how these U.S. banking records are relevant to Turkey's insider trading prosecution. Nor does the June 2017 Indictment itself shed any light on these basic questions. *See In Matter of Application*, 2024 WL 2883293 at * 6 ("it is hard to discern how the discovery Lazo seeks from … would be of any use to Lazo in defending himself."). The Court should quash the Subpoenas and vacate its Order for this additional reason.

***d. The Subpoenas Should be Quashed Because Turkey's Application is Untimely***

The Court should quash the Subpoenas and vacate the Order because Turkey's request for assistance is untimely. Although "the timing of petitioner's section 1782 application" "does not fit precisely within any of the *Intel* factors," courts have deemed it "to be a significant consideration" in exercising their discretion. *In re Hully Enterprises, Ltd.*, 358 F.Supp.3d 331, 348 (S.D.N.Y. 2019), *aff'd*, 400 F. Supp. 3d 62 (S.D.N.Y. 2019). "'[T]he Second Circuit has made clear that a request for assistance under section 1782 that is "inexcusably untimely' would

not provide an 'efficient means of assistance to the foreign proceedings,' which is one of the twin aims of the statute." *Id.* at 351 (citing *Nascimento* 600 F.App'x. at 812).

Turkey's Application is untimely. Regarding its insider trading claims, Turkey seeks evidence about events that occurred eleven years ago (in early 2014), for an investigation opened at least nine years ago (in April 2016), and in support of an indictment that was charged eight years ago (in June 2017). *See* ECF No. 1-4 (June 2017 Indictment, describing early 2016 investigation into alleged criminal activity that occurred in early 2014). Turkey's vague description of its money laundering investigation does not even detail the relevant dates of the conduct being investigated. However, the Subpoenas request records from over twenty-two years ago. *See* ECF No. 1-3 at 5, 7, 17, 19 (Subpoenas seeking records from December 2002 to present). In addition, the most recent of the "various financial transactions" identified in the Subpoenas, which Turkey does not allege are in any way related to the money laundering investigation or other criminal activity, occurred a decade ago (in June 2015). ECF Docs. 1-2 ¶ 6 (Kaçmaz Declaration); 1-3 at 9, 21 (Subpoenas). Turkey's need for the evidence requested in the Subpoenas should have been apparent no less than nine years ago when it appears to have opened the insider trading investigation. *In re Hulley Enterprises*, 358 F.Supp.3d 351-2 (request untimely when applicant waited seven years after being put "on notice" about allegations underlying requests which related to events that were sixteen years old). Turkey has provided no explanation for its long delay in filing the Application. *See In re Application of Nascimento for an Order to Take Discovery Pursuant to 28 U.S.C. § 1782*, No. 14 Misc. 20, 2014 WL 4457141, at *1 (S.D.N.Y. 2014), *aff'd*, 600 F. App'x 811 (2d Cir. 2015) (quashing subpoena where applicant "provid[ed] no reasonable explanation for the thirteen-year delay in pursuing a U.S.

subpoena”). The Court should therefore exercise its discretion to deny the Application as untimely and quash the Subpoenas and vacate the Order.

***e. The Bad Faith Nature of Turkey’s Request Weighs in Favor of Mr. Turkyolu Under the Second and Third Intel Factors***

The second and third discretionary *Intel* factors weigh in favor of quashing the Subpoena and vacating the Order because the nature of proceedings in which Turkey plans to use the Bank Records does not comport with basic and fundamental notions of due process. Relatedly, the Bank Records will be used to further Turkey’s bad faith attacks on the Gülen movement.

In analyzing the second *Intel* factor, courts in this circuit have generally focused on the “receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance.” *Salem*, 2024 WL 3026670 at *9 (citing *Intel Corp* 542 U.S. at 264-65)*; see e.g., In re Application of 000 Promneftstroy for an Order to Conduct Discovery for Use in a Foreign Proceeding*, 134 F.Supp.3d 789, 792 (S.D.N.Y. 2015) (“[t]he second discretionary factor asks the Court to weigh the foreign tribunal's ‘receptiveness’ to assistance from a United States court.”). However, Section 1782’s legislative history reflects that it is appropriate for a court to also examine “the nature and attitudes of the government of the country from which the request emanates and the character of the proceedings in that country.” S.Rep. No. 88–1580, 88th Cong., 2d Sess. (1963), reprinted in 1964 U.S.C.C.A.N. 3782, 3788. Professor Hans Smit, who helped draft 1964 amendments to Section 1782 commented that “[a] refusal to grant assistance under Section 1782 may also be based on the district court’s finding that, in some way, the foreign proceedings are unfair or incompatible with domestic notions of propriety.” Hans Smit, *American Assistance to Litigation in Foreign and International Tribunals: Section 1782 of Title 28 of the U.S.C. Revisited,* 25 Syracuse J. Int'l L. & Com. 1, 15 (1998).

Under the third *Intel* factor, courts assess whether the request would violate U.S. policies. *See Salem*, 2024 WL 3026670 at *9 ("whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States") (citation omitted). The Second Circuit has recognized "if the district court determines that a party's discovery application under section 1782 is made in bad faith, for the purpose of harassment…the court is free to deny the application in toto, just as it can if discovery was sought in bad faith in domestic litigation." *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1101 n. 6 (2d Cir. 1995); *see also In re Kivisto,* 521 F. Appx. 886 (11th Cir. 2013) ("[t]he district court also may consider whether the application contains 'unduly intrusive or burdensome requests'[]'made in bad faith, for the purpose of harassment.'") (citation omitted).

As described above, *see* Section II (a), the Application is part of a bad faith campaign by the Turkish government to target members of the Gülen movement because they are political opponents. Mr. Turkyolu's status as a member of the Gülen movement and the erosion of judicial independence in Turkey ensure that any proceeding brought by the Turkish government will be "unfair [and] incompatible with domestic notions of propriety." Smit, *American Assistance to Litigation in Foreign and International Tribunals* at 15. Any such proceeding will not afford Mr. Turkyolu basic due process rights, including safeguards against illegal procurement of evidence, the right to confront the evidence against him, and conviction on the weight of evidence before an impartial fact finder. *See supra* Section II (a). For the same reasons the Application fails to meet Section 1782's "for use" requirement, the Court should quash the Subpoenas and vacate the Order under the second and third discretionary *Intel* factors.

***f. The Fourth Intel Factor Weighs in Favor of Quashing Because the Subpoenas Are "Unduly Intrusive"***

The Subpoenas are "unduly intrusive" and should therefore be quashed under the fourth discretionary *Intel* factor. Courts considering the "unduly intrusive" nature of "Section 1782 applications borrow from the standards of Federal Rule of Civil Procedure 26." *In re Navios S. Am. Logistics Inc.*, 24-mc-575 (LJL), 2025 WL 369717, at *10 (S.D.N.Y. Feb. 3, 2025).

Under Fed. R. Civ. P. 26, a court must "consider the proportionality of discovery" and "may consider whether a request is…a 'fishing expedition.'" *In re Ativos Especiais II – Fundo de Investimento em Direitos - NP*, 24-mc-119 (LJL), 2024 WL 4169550, at *14 (S.D.N.Y. Sept. 12, 2024) (citation omitted). In addition, "[w]hen discovery is nominally for use in one proceeding but evidence suggests it is in fact for use in another proceeding for which it should not be granted under Section 1782, this can weigh against granting the petition." *Id.* at 15.

The Subpoenas do not satisfy Fed. R. Civ. P. 26 because they "call for information that goes far beyond anything that would be relevant in the foreign proceeding." *In re Navios S. Amer. Logistics Inc.*, 2025 WL 369717 at *9. Turkey seeks sensitive financial records spanning over twenty-two years (December 2002 to present) when the only purported criminal activity described by Turkey in even limited detail (insider trading) occurred over the course of mere months in 2014. *See* ECF Nos. 1-3 at 7, 19; 1-4 (insider trading indictment). Equally troubling is Turkey's failure to explain how the financial records are in any way related to this criminal activity. Turkey's vague and unsubstantiated claims of a money laundering investigation cannot otherwise justify its sweeping request. *See In re BonSens.org*, 95 F.4th 75, 80 (2d Cir. 2024) (an applicant under Section 1782 must "demonstrate that the evidence is minimally relevant to the foreign proceeding."). The Court should therefore quash the Subpoenas as "unduly intrusive."

In addition, the plain language of the Subpoenas reflects the hallmarks of an "unduly intrusive" request. *See* ECF No. 1-3 at 7, 17 (calling for production of "[a]ll documents" and "all

documents and communications”). This language is “often a red flag for overbreadth and undue burden.” *See Hedgeye Risk Mgmt., LLC v. Dale*, 21-CV-3687 (ALC) (RWL), 2023 WL 4353076, at *2 (S.D.N.Y. Jul. 5, 2023) (“[e]ach document request starts with “All Documents” or “All Communications,” which often is a red flag for overbreadth and undue burden.”). Similar requests have been rejected as “wildly overbroad” and “presumptively improper.” *See Optionality Consulting Pte. Ltd. v. Edge Tech. Grp. LLC*, 18-CV-5393 (ALC) (KHP), 2022 WL 1977746, at *4 (S.D.N.Y. June 3, 2022). The Court should do the same here.

Finally, in its Application, Turkey did not disclose the June 2016 Indictment against Mr. Turkyolu. Turkey’s failure to disclose this earlier indictment, its vague descriptions of its money laundering investigation and insider trading case, and its broad requests suggest that Turkey intends to use the Bank Records “in another proceeding” (i.e., in support of the June 2016 Indictment or some other act of political harassment). *Ativos Especiais II,* 2024 WL 4169550, at *15. The Subpoenas should be quashed and the Order vacated for this additional reason.

## III. The Foreign Sovereign Immunities Act Does Not Prohibit the Court from Quashing the Subpoenas and Ordering Other Remedial Measures

The Foreign Sovereign Immunities Act does not limit the Court’s ability to exercise jurisdiction over Turkey in this proceeding and provide Mr. Turkyolu with relief.

28 U.S.C. § 1605(a)(1) provides that sovereign immunity does not apply where “the foreign state has waived its immunity either explicitly or by implication.” However, this exception “must be construed narrowly.” *Drexel Burnham Lambert Grp., Inc. v. Committee of Receivers for Galadari*, 12 F.3d 317, 325 (2d Cir. 1993). The Second Circuit has recognized that “Congress primarily expected courts to hold a foreign state to an implied waiver of sovereign immunity by the state's actions in relation to the conduct of litigation.” *Smith v. Socialist*

*People's Libyan Arab Jamahiriya,* 101 F.3d 239, 244 (2d Cir. 1996). For example, if a foreign sovereign "engage[s] our courts in the very course of activity for which [another party] seek[s] redress it has waived its immunity as to that redress." *Siderman de Blake v. Republic of Argentia*, 965 F.2d 699, 722 (9th Cir. 1992).

Here, Turkey affirmatively filed its Application with the Court and sought the Court's assistance with obtaining discovery from the Banks. Turkey then reaped the benefits of the Order by serving the Subpoenas on the Banks and receiving the Bank Records. In doing so, Turkey submitted itself to the Court's jurisdiction. Turkey cannot invoke its status as a foreign sovereign to prevent the Court from exercising its "broad latitude to determine the scope of discovery and manage the discovery process" in this proceeding. *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 207 (2d Cir. 2012).

## CONCLUSION

For the reasons explained herein, Mr. Turkyolu respectfully requests that the Court quash the Subpoenas, vacate the Order, and direct Turkey to cease using and destroy the Bank Records.

Dated April 25, 2025

STEPTOE LLP

By: */s/ Michael C. Miller*
Michael C. Miller
Daniel W. Podair
1114 Avenue of the Americas
New York, NY 10036
(212) 506-3900
mmiller@steptoe.com
dpodair@steptoe.com

*Counsel for Cevdet Turkyolu*

**CERTIFICATION OF WORD COUNT**

I hereby certify that, pursuant to Local Civil Rule 7.1, the above Memorandum of Law, exclusive of the caption, table of contents, table of authorities, and signature block, contains 7,488 words and is therefore compliant with the word count limitations under Rule 7.1. I further certify that the above Memorandum was prepared on a computer using Microsoft Word.

Dated: New York, New York
April 25, 2025

*/s/Michael C. Miller*